**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **DR. MACKENZIE LERARIO,** | |
| **Plaintiff,** | **Case No.** |
| **v.** | **Complaint and Jury Demand** |
| **CORNELL UNIVERSITY, NEW YORK-PRESBYTERIAN/QUEENS and DR. MATTHEW FINK,** | |
| **Defendants.** | |

## PRELIMINARY STATEMENT

1. This is an action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. ("Title VII"), Title I of the Civil Rights Act of 1991, 42 U.S.C. § 1981a, the New York State Human Rights Law, N.Y. Exec. Law §290, et seq. ("NYSHRL") and New York City Human Rights Law § 8-108, et seq. ("NYCHRL").

## PARTIES

2. Plaintiff Dr. Mackenzie Lerario is a citizen of the United States and she is a resident of Westchester County, New York.

3. Defendant Cornell University is a private university and federal land grant institution, located in Ithaca, Tomkins County, New York, and is part of the State University of New York pursuant to N.Y. Education Law § 352. Cornell University owns and operates Weill Cornell Medical Center and Weill Cornell Medical College, located at 1300 York Avenue, New York County, New York, NY, an employer of Plaintiff, and shall be referred to herein as "Weill."

4. Defendant New York Presbyterian /Queens (NYP) is a corporation organized and existing under the laws of the State of New York,  56-45 Main Street, Flushing, Queens County, New York, 11355.

5. Defendant Dr. Matthew Fink is an employee of Defendant Weill, and NewYork Presbyterian Hospital/Weill Cornell Medical Center. He is Chair of Neurology at Weill Cornell Medical College and Neurologist-in-Chief at NewYork Presbyterian Hospital/Weill Cornell Medical Center. His office is located in New York County, New York.

6. At all relevant times, Defendant Weill has continuously been doing business in the State of New York and has continuously employed over fifteen (15) employees.

7. At all relevant times, Defendant Weill has continuously been an employer engaged in an industry affecting commerce within the meaning of Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e (b), (g) and (h).

8. At all relevant times, Defendant Weill has continuously been an employer as that term is defined in N.Y. Exec. Law §292.5.

9. At all relevant times, Defendant Weill has continuously been a person, employer and covered entity within the meaning of New York City Human Rights Law § 8-102.

10. At all relevant times, Defendant NYP has continuously been doing business in the State of New York and has continuously employed over fifteen (15) employees.

11. At all relevant times, Defendant NYP has continuously been an employer engaged in an industry affecting commerce within the meaning of Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e (b), (g) and (h).

12. At all relevant times, Defendant NYP has continuously been an employer as that term is defined in N.Y. Exec. Law §292.5.

13. At all relevant times, Defendant NYP has continuously been a person, employer and covered entity within the meaning of New York City Human Rights Law § 8-102.

## PROCEDURAL HISTORY

14. On or about May 15, 2020, Plaintiff Dr. Lerario filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC" or "Commission") alleging discrimination on the basis of sex and retaliation in violation of Title VII of the Civil Rights Act of 1964 by Defendants Weill and NYP.

15. On information and belief, the EEOC provided Defendants Weill and NYP with notice of the charge of discrimination.

16. On or about _____, the EEOC issued a Notice of Right to Sue to Plaintiff.

17. The Notice of Right to Sue was received on ____.

18. Plaintiff took all necessary steps to exhaust her administrative remedies.

19. Plaintiff took all necessary steps to fulfill all conditions precedent to the commencement of this lawsuit.

## JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the action is based on Title VII of the Civil Rights Act of 1964 and pursuant to 28 U.S.C. § 1337 because the action is based on a federal statute regulating commerce.

21. This Court has subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy as the federal claims.

22. Venue is proper in the United States District Court for the Southern District of New York pursuant to 42 U.S.C. 2000e-5(f) because a substantial part of the unlawful employment practices is alleged to have been committed within the United States District Court for the Southern District of New York, where also the employment records relevant to such practices are maintained and administered, and Plaintiff would have worked in this district but for the alleged unlawful employment practices.

**FACTS**

**Plaintiff Dr. Lerario's Sex and/or Gender**

23. Plaintiff Dr. Lerario is a female citizen of the United States.

24. Dr. Lerario has a female gender identity.

25. Dr. Lerario has a feminine gender expression.

26. Dr. Lerario is a woman who is transgender.

27. It is appropriate to refer to a transgender woman who has transitioned with female titles, honorifics (e.g., Miss, Ms., or Mrs.), and pronouns (e.g., her, hers, and she). Because Dr. Mackenzie Lerario is a medical doctor with an M.D. degree, she shall be referred to herein as "Dr. Lerario."

**Sex, Gender, Gender Expression, and Gender Identity**

28. *Sex* is a term that includes gender, gender expression, and gender identity within its meaning.

29. *Sex stereotyping* refers to the application by an employer of stereotypes related to sex to restrict, disparage, or discriminate on the basis of an employee's gender expression or identity.

30. *Gender* refers to cultural expectations specific to the sexes.

31. *Gender expression* refers to a person's gender-related appearance and behavior, whether or not stereotypically associated with the person's sex assigned at birth.

32. *Gender identity* refers to a person's internal sense of sex, being male, female, or other.

33. Gender identity is intractably rooted at a very early age and cannot be changed.

34. *Transgender individuals* are people who have a gender identity that does not match the sex they were assigned at birth.

35. *Gender transition*. Transgender individuals often seek out legal, social, and medical means of aligning external manifestations of their sex and gender with their gender identity. This process is colloquially known as *gender transition* or *transition*.

36. Discrimination against transgender people for being transgender is based on their sex, sex stereotyping, gender, gender expression, gender identity, or gender transition.

**Employment with Defendants Weill and NYP**

37. At all relevant times herein, Defendants Weill and NYP employed Plaintiff.

38. At all relevant times herein, Defendant Dr. Matthew Fink was Plaintiff's supervisor who was employed by Weill and NYP.

39. On or about July 1, 2015, Dr. Lerario was hired by Defendant Weill, and contracted to work at NYP through a medical service agreement as an attending neurologist on staff. She was later awarded the position of Site Director of the Neurology Clerkship at NYP on January 1, 2016.

40. She had research and teaching responsibilities at Weill's campus in New York, New York County, New York.

41. She received the position of Assistant Professor of Neurology at Weill Cornell Medical College.

42. In July 2016, she was named Medical Director of NewYork-Presbyterian's Mobile Stroke Treatment Unit Program through NewYork-Presbyterian Hospital. She was brought in to set up the program, based on her targeted experience and training in the field of stroke treatment.

43. She was on track for promotion to Associate Professor at Weill Cornell Medical College on July 1, 2021, after the six years at the Assistant Professor level specified in Weill's faculty handbook.

44. In 2018, her responsibilities were expanded to include supervision of teams of neurologists, nurses, paramedics and CT technicians at Columbia University in Manhattan, Weill/Cornell Medical Center in Manhattan, NYP and NewYork-Presbyterian Brooklyn Methodist Hospital.

45. At this time, she began reporting directly to Dr. Matthew Fink.

46. Dr. Lerario was considered a highly valued employee, and earned multiple promotions and salary increases.

47. In early 2019, her office was moved to Weill's main campus in Manhattan, and her job responsibilities for NYP were limited to services for the mobile stroke unit.

48. Arrangements were also made to expand her responsibilities to assist in overseeing the implementation of neurocritical care telemedicine services at NYP and NewYork-Presbyterian Brooklyn Methodist Hospital, as well as inpatient and Emergency Room teleneurology services at NewYork-Presbyterian Lower Manhattan Hospital.

49. These plans were thwarted because of discriminatory bias creating a hostile environment in which no reasonable person would work, resulting in Dr. Lerario's inability to remain on Defendants' campus, and this lawsuit.

50. In April 2019 Dr. Lerario notified her supervisor, Dr. Matthew Fink, that she would shortly be transitioning from male to female, and spoke to him about preparations to create a communications plan with her frequent workplace contacts.

51. Dr. Lerario's frequent workplace contacts network is large, spanning multiple hospitals, including NYP, Cornell and others, external medical organizations such as the international Pre-Hospital Stroke Treatment Organization (PRESTO) of which she was a Board Member, government agencies such as the Fire Department of New York, including the Regional Medical Advisory Committee (REMAC), and overseas and global medical professionals and organizations. Additionally, Dr. Lerario advised and spoke with multiple charitable donors to the hospital on various occasions at the request of NYP.

52. Therefore, it was important to speak to administrators and human resources in order to coherently plan a roll-out of information regarding her transition to avoid the inevitable disruption should organizations and professional colleagues learn this information on the fly.

53. Dr. Lerario found that there was no information or policy available on the NYP/Weill Cornell Medical Center intranet to determine the appropriate steps to take regarding transgender employees.

54. There was information regarding transgender students, but none of that information covered her situation as an employee.

55. The Hospital and the Center had no policy regarding how to appropriately accommodate a transgender employee.

56. NewYork-Presbyterian Hospital/Queens also did not provide transgender-inclusive healthcare.

57. Defendants Weill and NYP left their managers without guidance from the organization, leaving Dr. Lerario in the hands of untrained administrators and human resource professionals.

58. The reception to Dr. Lerario's gender transition by Dr. Fink, and other administrators, human resources professionals and co-workers, was hostile based on sex and/or gender, as detailed below.

59. Dr. Lerario found that the working conditions were intolerable, and would have been intolerable to any reasonable employee.

60. As a result, she was required to take time off from work to address these issues in September 2019.

61. She notified Defendants Weill and NYP of her need to take time off because of the hostile work environment and as a reasonable accommodation.

62. After consultation with doctors and therapeutic intervention, she returned to work on January 20, 2020.

63. Unfortunately, Defendants Weill and NYP had not taken prompt and effective action to abate the hostile work environment, and it was worse than when she had started her leave.

64. She notified Defendants Weill and NYP of the continued hostile work environment, and requested ADA accommodation in the form of additional leave.

**DR. MATTHEW FINK**

65. Dr. Lerario first approached her supervisor, Dr. Matthew Fink, Chair of Neurology at Weill Cornell Medical College and Neurologist-in-Chief at NYP/Weill Cornell Medical Center, regarding her gender transition.

66. She was concerned about her reception by Dr. Fink, because co-workers in his department expressed deep reservations about his treatment of employees of gay or lesbian sexual orientation.

67. In addition, there are apparently large resource allocation differences based on gender in the department, including salary, bonuses, research and travel funds and promotions.

68. Dr. Fink stated that the transition of the Electronic Health Record at Weill to include gender identity information was "ridiculous."

69. On April 9, 2019, Dr. Lerario advised Dr. Fink that she is transgender, and that, after serious consideration for years, she had decided to transition from male to female.

70. In response, he was unsympathetic, telling her "keep your personal life personal."

71. This response was crushing to Dr. Lerario.

72. A gender transition is a necessarily public event. It is unlike the situation of a person with a gay or lesbian sexual orientation, as that is information that a person can choose to disclose or not disclose.

73. Dr. Lerario did not have the option of keeping her gender transition to herself. Knowing that she was about to publicly transition with a supervisor who thought this should be hidden was a significant blow.

74. Dr. Fink interrogated her regarding others whom she had told at Weill and NYP.

75. When she advised that he was first person to whom she had spoken at work, he ordered her not to tell anyone else.

76. This too, was distressing, as it was a direct command from her supervisor that she was required to obey on peril of insubordination.

77. Dr. Fink demanded that she provide private medical information regarding her medical care, including where she had received her diagnosis and treatment.

78. Dr. Lerario provided the information demanded by Dr. Fink.  Dr. Fink responded by stating that "I know people" at the community health center where Dr. Lerario receives treatment. Dr. Lerario took this to mean that Dr. Fink was threatening her healthcare in an effort to keep her gender identity private.

79. Dr. Lerario suggested that they consider how to speak to administrators and human resources in order to create a coherent communication plan regarding her transition.

80. She explained that she wished to avoid the likely disruption should organizations and professional colleagues learn this information haphazardly.

81. Dr. Fink refused Dr. Lerario's request, and reiterated that Dr. Lerario must keep the information to herself.

82. Dr. Lerario disobeyed Dr. Fink's command to keep the information to herself, emailing some of her professional network at NewYork-Presbyterian and Weill Cornell Medical College with whom she works most closely in the Mobile Stroke Treatment Unit Program on April 19, 2019.

83. Dr. Lerario again requested of Dr. Fink that she be allowed to notify the department for which she works of her change in gender identity.

84. Dr. Fink flatly refused.

85. As a result of Dr. Fink's actions, many department faculty members, housestaff, and students were unaware of Dr. Lerario's change, which caused a hostile work environment when they became aware with no guidance from their employers.

86. Dr. Lerario began presenting as female on May 14, 2019.

87. Because Dr. Fink had refused Dr. Lerario's request to create a communication plan, colleagues were totally unprepared for Dr. Lerario's appearance as a female.

88. Colleagues did not know what to make of Dr. Lerario's gender transition because they had no guidance from their employers.

89. Dr. Lerario advised Dr. Fink of this, and requested several more times to provide education to people in her department, so that they would understand what was happening.

90. Dr. Fink nixed her requests, stating on one occasion "no, I don't want to make more of this than it is."

91. Dr. Lerario advised him that people would not understand why she was dressed in female clothing, if they were not provided with any communication or education about her gender identity.

92. Dr. Fink was unrelenting in his refusal.

93. As a result, it was extremely traumatic for Dr. Lerario when she began presenting as a female.

94. On May 14, 2019, her first day of presenting as female, she appeared for Morning Report, the case study morning meeting, presenting as female.

95. Faculty, residents, fellows, and students at the meeting were incredulous at Dr. Lerario's feminine presentation.

96. As a result of the Defendants' refusal to provide any communications or training, Dr. Lerario was treated very poorly as a result, including faculty laughing at her and highly inappropriate

statements and questions that created a hostile environment for Dr. Lerario based on sex and/or gender.

97. Dr. Fink's poor decision-making, and the lack of policy or training by NYP and Weill Cornell Medical College for these foreseeable issues, created a great deal of emotional distress for Dr. Lerario that was completely avoidable.

98. Dr. Lerario was forced to spend a great deal of time explaining this individually to colleagues.

99. There were many colleagues to whom she was unable to speak individually, and they were left to address her public gender transition on their own, with the inevitable biases and misperceptions held by the general public.

100. This was extremely wearing on Dr. Lerario, and she was subjected to inappropriate statements, questions, jokes, stares, gestures, and body language that made her feel extremely uncomfortable.

101. Other problems began to crop up with Dr. Fink.

102. Dr. Fink later told Dr. Lerario that he knew people at her medical treatment facility, and threatened to contact them, causing Dr. Lerario great alarm.

103. In an attempt to assist him in better understanding her position, Dr. Lerario provided Dr. Fink with a copy of a highly-regarded popular book on the subject of gender transition, entitled "She's Not There," by Jennifer Finney Boylan, a bestselling, award-winning work that has garnered universal praise for its sensitive portrayal of the transgender experience.

104. In response, Dr. Fink sent Dr. Lerario an email on June 25, 2019 implying that everyone had problems and implying that she did not deserve special treatment.

105. Dr. Lerario realized from this, and his previous statements, that Dr. Fink was not supportive of her gender transition.

106.    Things only got worse from here. For example, Dr. Fink regularly and frequently misgendered Dr. Lerario, despite being provided gentle corrections over months.

107.    On January 29, 2020, to express her difficulties in returning to work because of the hostile work environment, Dr. Lerario met with Dr. Fink and, reiterating the hostile environment she was confronting, informed him she cannot work under these conditions.

108.    As part of this discussion, Dr. Lerario stated her desire help other transgender people who were experiencing difficulties, to which Dr. Fink stated that he wanted to remove her job responsibilities as medical director, suggesting that her opposition to transgender discrimination was inappropriate in a work setting.

109.    As a result, Dr. Lerario was dissuaded from taking action to address the hostile work environment she was facing because she feared further retribution should she oppose discrimination.

110.    Dr. Fink continued making her work life difficult. For example, on two occasions, while Dr. Lerario was out on disability leave, knowing she was away due in part to psychological concerns raised by the hostile work environment, Dr. Fink scheduled two meetings via email.

111.    While Dr. Lerario should not have been included in such meetings while she was trying to recuperate, she nonetheless steeled and prepared herself to engage in the meetings.

112.    Dr. Fink cancelled each meeting at the last minute, causing Dr. Lerario further distress.

113.    After each cancellation, there was a phone call, in which he probed for personal and confidential medical information. Dr. Lerario was compelled to provide this information.

114.    Dr. Fink insisted that Dr. Lerario should return to work regardless of her medical condition because "that's what I would do."

**MR. DANIEL RIBAUDO**

115.    Daniel Ribaudo is director of Emergency Medical Services ("EMS") for NewYork-Presbyterian Health System.

116.    Dr. Lerario worked with him closely because EMS is the point of contact between the public and the Mobile Stroke Unit Program.

117.    Mr. Ribaudo's reaction to Dr. Lerario's gender transition was very negative.

118.    He misgendered her all the time, and very unapologetically, despite her gentle corrections.

119.    Mr. Ribaudo very pointedly told her about a lawsuit against the Hospital by an employee with an LGBTQ identity who also alleged discrimination and harassment based on sexual orientation.

120.    Mr. Ribaudo implied that negative treatment of people with an LGBTQ identity is not unusual at the Hospital, and that she needed to beware.

121.    Dr. Lerario found this very concerning.

122.    Mr. Ribaudo called Dr. Lerario, upset and angry, and told her that a friend of his who is a truck driver had come out to him as transgender.

123.    He stated that he had no idea what to do, and asked Dr. Lerario for advice.

124.    She told him to take care to gender the person appropriately, to advise them of his care and love, and to consider attending a pride event or read a book on the subject.

125.    Mr. Ribaudo was silent, abruptly stated that he had to go, and rang off.

126.    She asked him a week or two later about how his friend was doing.

127.    In response, Mr. Ribaudo pointedly ignored her, looking away and refusing to speak to her.

128.    In fact, he stopped all meetings with her.

129.    Normally, Mr. Ribaudo and others are quite collegial, walking informally into the offices of co-workers to exchange pleasantries or have lunch or coffee.

130.    Mr. Ribaudo stopped all informal contact with Dr. Lerario at that point. For example, in January 2020,  prior to returning to work recently, Dr. Lerario was at the campus and stopped in to say hello and tell Mr. Ribaudo that she was returning to work. He was sitting in his office eating lunch with the door open. He refused to even acknowledge her presence, and only begrudgingly after several tense minutes did he agree to talk to her. He used the word "man" to apply to Dr. Lerario three times during this exchange without apology. Dr. Lerario found this very disheartening.

131.    Dr. Lerario emailed Mr. Ribaudo to ask that he not do so in the future and advised that she can help him find appropriate sensitivity training.

132.    His response was an insincere apology, with no mention of sensitivity training, and no sensitivity training occurred following this request.

133.    Management in NewYork-Presbyterian Emergency Medical Services allowed Dr. Lerario the use of a parking spot in the Weill Cornell ambulance bay prior to her gender transition. After coming out, Mr. Ribaudo instructed Dr. Lerario to no longer use this parking space.

134.    Dr. Lerario alerted Dr. Fink on multiple occasions in January she was being mistreated by Mr. Ribaudo because of her gender.

135.    Dr. Fink refused to address these concerns.

**DR. JOSEPH SAFDIEH**

136.    Dr. Joseph Safdieh is the Vice Chair of Neurology, Assistant Dean for Clinical Curriculum, Vice Chairman for Education and Associate Professor of Neurology at Weill Cornell Medicine.

137.    Dr. Lerario came out to Dr. Safdieh in April 2019 at Dr. Fink's request.  During this conversation, Dr. Safdieh nonchalantly dismissed Dr. Lerario's initiation of a gender transition as "no big deal" and stated flatly "you'll be fine."

138.    Soon after Dr. Lerario started presenting as female, Dr. Safdieh told her in a joking manner that she "overwhelmed" Dr. Frank Petito, a senior faculty member, and that he personally had to "calm Petito down."

139.    This might seem unremarkable, were it not for the well-known fact in the department that Dr. Petito has a penchant for hugging female residents.

140.    In January 2020, Dr. Lerario was perturbed by Dr. Safdieh's making a joke of her transition.

141.    As she said to him at the time, "it seems like there is a joke that I'm not in on."

142.    After Dr. Lerario returned to work on January 27, 2020, she met with Dr. Safdieh on January 29, 2020.

143.    Dr. Safdieh misgendered her on several occasions during this meeting, calling her "he" or "him."  Dr. Safdieh explained that he felt "overwhelmed" by Dr. Lerario's issues with her gender transition in the Neurology department and that was why he was frequently misgendering her.

144.    This occurred after her meeting with Dr. Fink, in which Dr. Fink said he would decrease her job responsibilities because she expressed her desire to be an advocate for transgender people, Dr. Lerario was dissuaded by this from opposing the hostile work environment that she faced, and she felt forced to reassure Dr. Safdieh that his constantly misgendering her was "okay." It was not, in fact, "okay."

145.    Dr. Safdieh also commented on Dr. Lerario's weight, stating that her weight fluctuates and she looks good "now that [she] lost weight." This made Dr. Lerario very uncomfortable that Dr. Safdieh was tracking her weight and looks.

146.    Although the purpose of the meeting initiated by Dr. Lerario with Dr. Safdieh was to discuss issues she was having within the neurology department due to her gender identity and sexual orientation, Dr. Safdieh refused to discuss this topic on several occasions when Dr. Lerario brought up that this was the purpose of the meeting.

147.    On several occasions, Dr. Safdieh's comments expressed knowledge of private conversations held with Dr. Fink earlier in the day, and Dr. Safdieh repeatedly made demands of Dr. Lerario to discuss a timeline of her position as medical director and development of the mobile treatment unit program.

148.    Dr. Safdieh demanded on multiple occasions to discuss what Dr. Lerario's job responsibilities are and what percentage of her time is dedicated to various tasks, a type of micromanagement and scrutiny to which neither others nor Dr. Lerario prior to transition were subjectd.

149.    Dr. Safdieh repeatedly told Dr. Lerario she should have only a clinical position at the hospital because that is "what she is good at", knowing that her interests and recent career trajectory was to develop an administrative and leadership career at the hospital (prior to coming out as a transgender woman).

150.    When Dr. Lerario confronted Dr Safdieh that this treatment was due to her gender identity and sexual orientation, he scolded: "I can't talk to Matt [Fink] about this to advocate on your behalf; I have to worry about my own job".

151.    By this, he meant that Dr. Lerario's position at the hospital had become tenuous because of her gender transition, to which Dr. Fink was opposed, and which would subject Dr. Safdieh to retaliation should he advocate for Dr. Lerario.

152.    It is also notable that prior to her transition, she had inquired about the career path of health care executives and the requirement of an MBA.

153.    She was assured by many, including Dr. Fink and Dr, Safdieh, that an MBA was not necessary to be a successful health care executive.

154.    However, after transition, when she asked Dr. Fink about the career path for health care executives, Dr. Fink told her that she was "great" at clinical neurology, but that she would need an MBA in order to be a successful health care executive.

155.    Dr. Safdieh confirmed this during his meeting with Dr. Lerario.

156.    She found this discouragement puzzling, and its implication that Dr. Safdieh and Dr. Fink now found her career to be limited by her transition.

**HUMAN RESOURCES**

157.    Dr. Lerario went to the Human Resources Department on January 9, 2020, to address her impending return to work.

158.    She spoke with Jamal Lopez, Senior Director of HR, and Jennifer Alberto, HR representative.

159.    She expressed her concern about ensuring a safe environment, both physically and emotionally.

160.    They were unsympathetic to her concerns.

161.    Mr. Lopez's response was that Weill Cornell Medicine "cannot provide transparency", that

his foremost priority was to "protect the institution from liability" and he will "reach out to legal".

162.    He repeatedly told Dr Lerario to report the mistreatment to her boss and chair, Matthew Fink.

163.    Of course, Dr. Fink was part of the hostile work environment to which she was subjected.

164.    Dr. Lerario also spoke with Angela Charter-Lent, the Senior Director of Human Resources at NYP, and Dr. Rache Simmons, the Associate Dean of Diversity & Inclusion.

165.    Dr. Lerario advised them of hostile experiences based on sex and/or gender, but they insisted that NYP would do nothing to address these hostile experiences because NYP had no liability.

166.    Dr. Lerario notified human resources in late spring 2019 regarding her gender identity and preferred name.

167.    She was provided no advisement, resources, or support.

168.    Instead, she was told she was not allowed to use her correct female name in the Weill systems until she provided certain documents.

169.    This caused her significant distress, because she was not allowed to use her correct female name, and this discriminatory requirement forced her to rush to obtain multiple government documents before she was allowed her right to use her correct female name.

170.    She also had to push senior leadership, including Shaun Smith, in order to have her name change processed in a timely fashion.

**OTHER HOSTILITY**

171.    Dr. Lerario was required to work with personnel from the Fire Department of New York ("FDNY") due to their involvement with emergency medical services.

172.    She had a good rapport with FDNY personnel prior to her transition.

173.    After her gender transition, she was met with disdain and ostracism from those same personnel.

174.    Dr. Lerario advised Dr. Fink of these problems, but no prompt and effective action was taken to address the problem.

175.    Dr. Lerario also had a good rapport with Emil Smith, Director of Business Administration at NYP, prior to her transition.

176.    Afterwards, however, Mr. Smith refused to meet with her despite her requests.

177.    She had to go to his superiors in order to make this happen.

178.    Dr. Lerario shared an administrative assistant with Mr. Smith.

179.    After her transition, Mr. Smith began to direct the assistant not to take certain meetings with Dr. Lerario and also directed her to refuse to meet with Dr. Lerario.

180.    Mr. Smith directed her not to do certain kinds of work required by Dr. Lerario, although the work that Dr. Lerario was directing her to undertake was work appropriate to an assistant of this kind.

181.    Dr. Lerario had a good relationship with Dr. Babak Navi, Medical Director of the Cornell Stroke Center, prior to transition.

182.    However, on January 28, 2020, when Dr. Lerario returned to work, Dr. Navi called her "man," with great emphasis.

183.    He then stared at her, in effect daring her to react.

184.    Dr. Lerario felt that he had intended to offend her.

185.    Dr. Lerario was also misgendered by several people, including Shaun Smith, Senior Vice-President and Chief Human Resources Officer.

186.    When Dr. Lerario approached Dr. Juan Mejia, Senior Vice-President and Chief Operating Officer of Defendant NYP, about transgender inclusion both with regard to the working environment, the patient environment, and the lack of transgender healthcare availability, she was told by Dr. Mejia that this was "not a priority for NYP."

187.    Juan Mejia, who also chairs the LGBT steering committee, has been working for years on one of the most basic and simple accommodations for transgender patients, that of using preferred names, but the policy has never been created or implemented.

188.    As a result, many transgender patients, including Dr. Lerario, are routinely misgendered and called by the wrong names.

189.    Additionally, Dr. Mejia informed Dr. Lerario that NYP has a policy that employees are not allowed to wear preferred pronoun buttons, unless during Pride.

190.    Upon her return to work on January 27, 2020, Dr. Lerario found that she was receiving mail in an envelope with her former, incorrect male name handwritten on it.

191.    She found this quite disturbing, and was surprised that the simplest of changes could not be implemented reliably at her workplace.

192.    Dr. Yoon Kang, Senior Associate Dean for Medical Education at Weill Cornell Medical College, met with Dr. Lerario in May 2019 at Dr. Safdieh's request.

193.    During this meeting, Dr. Kang informed Dr. Lerario that there were no other transgender faculty at Weill Cornell, and she was hoping to search at other medical colleges to find an appropriate person to help advise Dr. Lerario during her gender transition.  She also stated during this meeting that it would be helpful to inform the Weill Cornell student body of her gender transition to avoid confusion, since Dr. Lerario frequently has worked with medical students in multiple roles at New York-Presbyterian Queens, Weill Cornell Medical College,

and the Mobile Stroke Treatment Unit Program.

194.    Subsequent to this meeting, Dr. Kang abruptly informed Dr. Lerario that neither of these

        things were possible, which left Dr. Lerario without faculty mentorship or the ability to inform

        students she has worked with of the gender change.

195.    It had been months since she changed her name with the hospital and the college.

196.    She was left to conclude that this was either lack of training or intentional.

197.    However, when Dr. Lerario presented the letter to Dr. Fink to advise of this inappropriate

        conduct, he shouted at her. "Don't show me that," he berated her in a loud voice.

198.    Dr. Lerario was mentoring Dr. Saad Mir (Weill Cornell Mobile Stroke Treatment Unit

        Site Director and Lower Manhattan Hospital Site Chief) in the mobile stroke treatment unit

        program and was involved in his development as a future leader in the mobile stroke

        treatment unit program and the neurology department.

199.    Dr. Mir contacted Dr. Lerario multiple times via phone and text while she was on leave to

        ask inappropriately personal questions about her healthcare related to her gender identity that

        made Dr. Lerario uncomfortable.

200.    In December 2019, Dr. Mir informed Dr. Lerario on the phone that her healthcare issues

        were "fascinating" to him.

201.    When Dr. Lerario instructed him that these statements are inappropriate, he stopped

        communication with Dr. Lerario and admitted he no longer desired a leadership position in

        the mobile stroke treatment unit program.

202.    On January 31, 2020 Dr. Lerario was walking past Dr. Mir's office and said hi through

        the open door.

203. Dr. Mir suggestively and very slowly stared at Dr. Lerario up and down (then back again) from her head to her toes before saying hi in return.

204. Dr. Mir intended this as a negative commentary on her gender.

205. Dr. Lerario initiated a meeting with Dr. Steven Kaplan (Associate Chief Medical Officer, NewYork-Presbyterian Hospital) in January 2020 at Dr. Fink's request to discuss her personal issues with gender identity and sexual orientation she was having at NYP.

206. At the beginning of the meeting on January 30, Dr. Kaplan asked if he could take a phone call, which he immediately put forward to his smartwatch and he said nothing over the phone. He then said, "go ahead" to Dr. Lerario.

207. This made Dr. Lerario uncomfortable because it appeared he was recording their conversation.

208. Dr. Lerario became even more uncomfortable when Dr. Kaplan refused to discuss items related to her issues at NYP regarding her gender identity or sexual orientation.

209. On multiple occasions, he expressed knowledge of private conversations Dr. Lerario held with Dr. Fink.

210. He demanded of Dr. Lerario that she discuss a timeline of her medical director position and development of the mobile stroke treatment unit program.

211. He also repeatedly asked Dr. Lerario what her personal feelings and thoughts were of three multiple key personnel in leadership positions at the hospital.

212. This made it clear to Dr. Lerario that the purpose of this meeting was not to assist her, to provide her with any resources or to help her gain reasonable accommodations at the hospital.

213. Rather, his purpose was to stonewall and ignore her complaints of discrimination.

214.    Prior to January 2020, Dr. Lerario and Dr. Dr. Matthew Robbins (Associate Professor of Neurology and Residency Program Director) enjoyed a friendly, collegial relationship.

215.    When Dr. Lerario attended the neurology department's morning report on January 31, 2019, Dr. Robbins visibly scowled at Dr. Lerario, making it clear that he did not wish to see her or speak to her. He explicitly refused to speak with her after the meeting was over.

216.    He did so because of her gender transition and her complaints of discrimination.

217.    Her work email address with a Cornell domain name (mpl9005@med.cornell.edu), still appears with her prior male name as of the date of this filing.

218.    Dr. Lerario complained to Defendants Weill and NYP of these events again by letter of February 3, 2020 and February 26, 2020, requesting that prompt and effective action be taken to address the hostile work environment.

219.    In response, Dr. Lerario was informed by Defendants on March 30, 2020 that Weill Cornell had not completed its investigation, but denied that Dr. Lerario experienced any discrimination or hostile work environment on account of her gender or gender expression during her employment.

220.    The fact that Defendants were denying a hostile work environment prior to completing their investigation demonstrates that their investigation is a sham, that "no discrimination" is a foregone conclusion, and that Weill Cornell planned to take no action to address her concerns.

221.    On July 20, 2020, Dr. Lerario received correspondence from NewYork-Presbyterian referring to the Neurology department as her "former department", which Dr. Lerario took to mean that NewYork-Presbyterian no longer wishes to employ Dr. Lerario due to her gender identity.

222.    On July 30, Dr. Lerario again advised his supervisor, Defendant Dr. Matthew Fink, and

Weill Cornell Human Resources that the conditions had become intolerable based on the discrimination she was experiencing, and that nothing had been done to change this.

223.    Dr. Lerario requested of Defendant NYP on several occasions between July 20 and August 9, 2020, that her case logs be provided to her, which she advised was a time-sensitive request, and could affect contracting in a job application.

224.    She received no response to her requests.

225.    Her employer had essentially stopped communicating with her, signaling that her gender transition, her reporting of discrimination complaints and opposing discrimination, were punishable by ostracism, regardless of consequences to Dr. Lerario.

226.    That was the last straw leading to the filing of this action.

**CAUSES OF ACTION**

**COUNT 1**
**42 U.S.C. §2000e, et seq.**
**Hostile Work Environment**
**[As Against Defendants Weill and NYP]**

227.    Plaintiff Dr. Lerario incorporates by reference the preceding paragraphs as if fully set forth herein.

228.    Dr. Lerario is a member of a protected category with regard to sex and /or gender including and gender expression.

229.    Dr. Lerario was targeted for harassment and subjected to a hostile work environment because of her sex and/or gender, including sex stereotyping and gender expression.

230.    Defendants' managers instituted a campaign of harassment and discrimination against Dr. Lerario on the basis of sex and/or gender, including sex stereotyping and gender expression, and adopted adversarial attitudes and hostile demeanors.

231.    This harassment was severe and pervasive, happening on several occasions over a few weeks, and involved immediate physical threats, and continued until Dr. Lerario's unlawful termination by Defendants Weill and NYP.

232.    Dr. Lerario was targeted for harassment and subjected to a hostile work environment by her managers because of her sex and/or gender, including sex stereotyping and gender expression.

233.    The discriminatory acts were unwelcome to Dr. Lerario.

234.    Discriminatory intimidation, ridicule, and insult permeated the work environment, and was sufficiently severe or pervasive to alter the conditions of Dr. Lerario's employment and to create an abusive working environment, as detailed herein.

235.    Defendants' managers made statements that demeaned Dr. Lerario's sex and/or gender expression, including sex stereotyping and gender expression, as detailed herein.

236.    This hostile environment unreasonably interfered with Dr. Lerario's ability to perform her job duties, by disrupting her relationship to Defendants and its management, by the unreasonable criticism and scrutiny of Dr. Lerario's gender and gender expression which flowed directly from Defendants' failure to take prompt and effective action to stop the hostile work environment, by Dr. Lerario's need to spend time on otherwise unnecessary grievance processes and other means of seeking relief, and her reasonable fear for her safety, amongst other reasons, and created working conditions intolerable to a reasonable person.

237.    The effects of the hostile environment alleged herein were felt by Dr. Lerario daily.

238.    The hostile environment was severe, including threats of bodily harm, reasonably invoking fear of physical confrontations.

239.    Many events contributing to this hostile work environment occurred within the 300-day period prior to Dr. Lerario's first EEOC charge.

240.    Dr. Lerario perceived the working environment to be abusive or hostile.

241.    A reasonable woman in Dr. Lerario's circumstances would consider the working environment to be abusive or hostile.

242.    Dr. Lerario would not have been the object of harassment but for her gender.

243.    Defendants was on notice of the hostile work environment, including actual notice by means of complaints made by Dr. Lerario to Defendant as detailed herein, and vicariously and constructively by means of the acts perpetrated by Dr. Lerario's direct supervisor.

244.    Defendants did not undertake prompt and effective efforts sufficient to stop the hostile environment detailed herein.

245.    As a direct and proximate result of Defendants' unlawful discrimination, Dr. Lerario incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, damage to her professional reputation, and other pecuniary and non-pecuniary losses.

246.    By engaging in the conduct described above, Defendants terminated Dr. Lerario intentionally, knowingly or recklessly with regard to Dr. Lerario's federally protected rights, for which Plaintiff seeks punitive damages.


**COUNT 2**
**42 U.S.C. §2000e, et seq.**
**Constructive Termination Because of Sex**
**[As Against Defendants Weill and NYP]**

247.    Plaintiff Dr. Lerario incorporates by reference the preceding paragraphs as if fully set forth herein.

248.  Dr. Lerario is a member of a protected category, i.e., sex and/or gender.

249.  Dr. Lerario's work environment was continuously hostile since her gender transition.

250.  The hostile work environment created an environment so intolerable that no reasonable person would continue to work under such conditions.

251.  Dr. Lerario was constructively terminated by the Defendants because of her sex and/or gender, including sex stereotyping, and gender expression.

252.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiff Dr. Lerario suffered damages including but not limited to lost wages, humiliation, emotional distress, and other pecuniary and non-pecuniary losses.

253.  By engaging in the conduct described above, Defendants terminated Dr. Lerario intentionally, knowingly or recklessly with regard to Dr. Lerario's federally protected rights, for which Plaintiff seeks punitive damages.

**COUNT 3**
**42 U.S.C. §2000e, et seq.**
**Retaliation**
**[As Against Defendants Weill and NYP]**

254.  Plaintiff Dr. Lerario incorporates by reference the preceding paragraphs as if fully set forth herein.

255.   The effect of Defendants' acts complained of above was to deprive Dr. Lerario of equal employment opportunities as an employee because of retaliation for her complaints of discrimination in violation of Title VII and Title I of the Civil Rights Act of 1991.

256.    By complaining to Defendants about the discriminatory practices and hostile work environment described herein, opposing said practices and hostile work environment directed at herself, Dr. Lerario engaged in activities protected by Title VII.

257.    Dr. Lerario's exercise of protected rights was known to Defendants.

258.    Following and because of Dr. Lerario's Title VII protected conduct, Dr. Lerario was subjected to tangible or adverse employment actions, including termination.

259.    The actions taken against Dr. Lerario would dissuade a reasonable employee from making or supporting a complaint of discrimination.

260.    By engaging in the conduct described above, Defendants intentionally retaliated against Dr. Lerario with malice or reckless indifference to Dr. Lerario's federally protected rights to oppose practices that are prohibited by Title VII.

261.    As a direct and proximate result of Defendants' unlawful retaliation, Dr. Lerario has incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, damage to her professional reputation, and other pecuniary and non-pecuniary losses.

**COUNT 4**
**Americans with Disabilities Act**
**42 U.S.C. § 12101, et seq.**
**Hostile Work Environment Because of Disability**
**[As Against Defendants Weill and NYP]**

262.    Plaintiff realleges all previous paragraphs as if fully set forth herein.

263.    Defendants' managers and employees working with Dr. Lerario were aware that she had become disabled, including but not limited to gender dysphoria, generalized anxiety disorder and depression.

264.    Dr. Lerario was targeted for harassment and subjected to a hostile work environment because of her disabilities.

265.    The discrimination that Dr. Lerario experienced was due to her being disabled or Defendants' perception of her as disabled.

266.    Defendants did not undertake prompt and effective efforts sufficient to stop the hostile environment detailed herein.

267.    As a direct and proximate result of Defendants unlawful discrimination, Dr. Lerario has incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, damage to professional reputation, and other pecuniary and non-pecuniary losses.


**COUNT 5**
**Americans with Disabilities Act**
**42 U.S.C. § 12101, et seq.**
**Disparate Treatment Because of Disabilities**
**[As Against Defendants Weill and NYP]**


268.    Plaintiff realleges all previous paragraphs as if fully set forth herein.

269.    Dr. Lerario requested the following *inter alia* as reasonable accommodations:

   a. Transfer to Office at Columbia University Irving Medical Center, close in proximity to other Department of neurology faculty
   b. Permission to pursue medically necessary medical interventions, treatments, and medical appointments during business hours.
   c. Review of LGBT policies, protocols and training regarding transgender employees and patients, including support and medical resources offered to transgender patients and employees.
   d. Tele-commuting permission when off service, to the extent it does not interfere with necessary in-person work meetings.
   e. Permission to use noise-cancelling headphones and white noise machines to address attentional concerns
   f. Parking spot on campus without need for interaction with valet, as the parking facility staff very often misgenders Dr. Lerario.

    g.  Provision of new mentorship for research, personal improvement, operations training, committee work, LGBT healthcare issues, and MSTU-related items.

    h.  Designation of an ombudsperson with training in transgender issues to address harassment or hostility based on gender, gender expression or gender identity, to include issues with NYP/WCM/CUIMC employees.

    i.  Cease all NYP or WCM-branded promotional materials (including electronic) regarding Dr Lerario's gender minority status.

270.    With or without reasonable accommodations, Dr. Lerario was qualified for the position with Defendants.

271.    The requested accommodations were denied.

272.    The effect of the discrimination complained of above has been to deprive Dr. Lerario of equal employment opportunities and otherwise adversely affect her status as an employee because of her disabilities in violation of the Americans with Disabilities Act of 1990, as amended.

273.    By creating, condoning, and perpetuating discrimination because of Dr. Lerario's disabilities, Defendants have acted intentionally, maliciously and/or recklessly.

274.    As a direct and proximate result of Defendants' unlawful discrimination, Dr. Lerario has incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, damage to professional reputation, and other pecuniary and non-pecuniary losses.

**COUNT 6**
**New York State Human Rights Law, N.Y. Exec. Law §290 et seq.**
**Termination Because of Sex and/or Gender, Including Gender Identity**
**[As Against All Defendants]**

275.    Plaintiff Dr. Lerario incorporates by reference the preceding paragraphs as if fully set forth herein.

276.    Dr. Lerario is a member of a protected category with regard to sex and/or gender, including gender identity.

277.    Dr. Lerario was terminated by the Defendants because of her sex and/or gender, including gender identity.

278.    Defendants' termination of Plaintiff Dr. Lerario constitutes a violation of N.Y. Exec. §296.

279.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff Dr. Lerario suffered damages including but not limited to lost wages, humiliation, emotional distress, and other pecuniary and non-pecuniary losses.

280.    By engaging in the conduct described above, Defendants terminated Dr. Lerario intentionally, knowingly or recklessly with regard to Dr. Lerario's state protected rights, for which Plaintiff seeks punitive damages.

## COUNT 7
### New York State Human Rights Law, N.Y. Exec. Law §290 et seq.
### Hostile Work Environment Because of Sex and/or Gender, Including Gender Identity

281.    Plaintiff Dr. Lerario incorporates by reference the preceding paragraphs as if fully set forth herein.

282.    Dr. Lerario is a member of a protected category with regard to sex and/or gender, including gender identity.

283.    Defendants' managers instituted a campaign of harassment and discrimination against Dr. Lerario on the basis of sex and/or gender, including gender identity, and adopted adversarial attitudes and hostile demeanors.

284.    This harassment created inferior terms, conditions or privileges of employment.

285.    Dr. Lerario was targeted for harassment and subjected to a hostile work environment by her managers because of her sex and/or gender, including gender identity.

286.    The discriminatory acts were unwelcome to Dr. Lerario.

287.    Defendants' managers made statements that demeaned Dr. Lerario's sex and/or gender, including gender identity, as detailed herein.

288.    This hostile environment unreasonably interfered with Dr. Lerario's ability to perform her job duties, by disrupting her relationship to Defendants and its management, by the unreasonable criticism and scrutiny of Dr. Lerario's gender which flowed directly from Defendants' failure to take prompt and effective action to stop the hostile work environment, by Dr. Lerario's need to spend time on otherwise unnecessary grievance processes and other means of seeking relief, and her reasonable fear for her safety, amongst other reasons, and created working conditions intolerable to a reasonable person.

289.    The effects of the hostile environment alleged herein were felt by Dr. Lerario daily.

290.    The hostile environment created inferior terms, conditions or privileges of employment, including threats of bodily harm, reasonably invoking fear of physical confrontations.

291.    Dr. Lerario perceived the working environment to be abusive or hostile.

292.    A reasonable woman in Dr. Lerario's circumstances would consider the working environment to be abusive or hostile.

293.    Defendants was on notice of the hostile work environment, including actual notice by means of complaints made by Dr. Lerario to Defendant as detailed herein, and vicariously and constructively by means of the acts perpetrated by Dr. Lerario's direct supervisor.

294.    Defendants did not undertake prompt and effective efforts sufficient to stop the hostile environment detailed herein.

295.    As a direct and proximate result of Defendants' unlawful discrimination, Dr. Lerario incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, damage to her professional reputation, and other pecuniary and non-pecuniary losses.

**COUNT 8**
**New York State Human Rights Law**
**NYHRL § 296, et seq.**
**Hostile Work Environment Because of Disability**
**[As Against All Defendants]**

296.    Plaintiff realleges all previous paragraphs as if fully set forth herein.

297.    Dr. Lerario was targeted for harassment and subjected to a hostile work environment because of her disabilities, including gender dysphoria.

298.    The discrimination that Dr. Lerario experienced was due to her being disabled or Defendants' perception of her as disabled.

299.    Defendants' did not undertake prompt and effective efforts sufficient to stop the hostile environment detailed herein.

300.    As a direct and proximate result of Defendants' unlawful discrimination, Dr. Lerario has incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, damage to professional reputation, and other pecuniary and non-pecuniary losses.

## COUNT 9
## New York State Human Rights Law
## NYHRL § 296, et seq.
## Disparate Treatment Because of Disability
## [As Against All Defendants]

301.    Plaintiff realleges all previous paragraphs as if fully set forth herein.

302.    Dr. Lerario requested reasonable accommodations for her disabilities

303.    With or without reasonable accommodations, Dr. Lerario was qualified for the position with Defendants.

304.    Defendants denied the reasonable accommodations requested by Plaintiff.

305.    By so doing, Respondent failed to provide a reasonable accommodation for Dr. Lerario's disabilities.

306.    The effect of the discrimination complained of above has been to deprive Dr. Lerario of equal employment opportunities and otherwise adversely affect her status as an employee because of her disabilities in violation of the New York State Human Rights Law.

307.    By creating, condoning, and perpetuating discrimination because of Dr. Lerario's disabilities, Defendants' has acted intentionally, maliciously and/or recklessly.

308.    As a direct and proximate result of Defendants' unlawful discrimination, Dr. Lerario has incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, damage to professional reputation, and other pecuniary and non-pecuniary losses.

**COUNT 10**
**New York State Human Rights Law, N.Y. Exec. Law §290 et seq.**
**Retaliation**
**[As Against All Defendants]**

309.   Plaintiff Dr. Lerario incorporates by reference the preceding paragraphs as if fully set forth herein.

310.    The effect of Defendants' acts complained of above was to deprive Dr. Lerario of equal employment opportunities as an employee because of retaliation for her complaints of discrimination in violation of N.Y. Exec. Law §290.

311.   By complaining to Defendants about the discriminatory practices and hostile work environment described herein, opposing said practices and hostile work environment directed at herself, Dr. Lerario engaged in activities protected by N.Y. Exec. Law §290.

312.   Dr. Lerario's exercise of protected rights was known to Defendants.

313.   Following and because of Dr. Lerario's protected conduct, Dr. Lerario was subjected to tangible or adverse employment actions, including termination.

314.   The actions taken against Dr. Lerario would dissuade a reasonable employee from making or supporting a complaint of discrimination.

315.   By engaging in the conduct described above, Defendants intentionally retaliated against Dr. Lerario with malice or reckless indifference to Dr. Lerario's state protected rights to oppose practices that are prohibited.

316.   As a direct and proximate result of Defendants' unlawful retaliation, Dr. Lerario has incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, damage to her professional reputation, and other pecuniary and non-pecuniary losses.

**COUNT 11**
**NYCHRL § 8-107, et seq.**
**Hostile Work Environment**
**Because of Sex and/or Gender, Including Gender Identity**
**[As Against All Defendants]**

317.    Plaintiff realleges all previous paragraphs as if fully set forth herein.

318.    Dr. Lerario was targeted for harassment and subjected to a hostile work environment because of sex and/or gender, including gender identity in violation of the New York City Human Rights Law, New York City Administrative Code § 8-107, et. seq.

319.    Defendants is directly liable for the deprivation of Dr. Lerario's rights by exercising its authority to allow, create and perpetuate a hostile work environment based on sex and/or gender, including gender identity.

320.    Defendants aided and abetted in the deprivation of Dr. Lerario's rights because of discrimination against her by actually participating in the conduct giving rise to her claim for hostile work environment.

321.    As a direct and proximate result of Defendants' unlawful discrimination, Dr. Lerario has incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, damage to professional reputation, and other pecuniary and non-pecuniary losses.

322.    By engaging in the conduct described above, Defendants discriminated against Dr. Lerario with willful or wanton negligence, or recklessness or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard, with regard to Dr. Lerario's protected rights under NYCHRL § 8-107, for which Plaintiff seeks punitive damages.

**COUNT 12**
**NYCHRL § 8-107, et seq.**
**Termination Because of Sex and/or Gender, Including Gender Identity**
**[As Against All Defendants]**

323.    Plaintiff realleges all previous paragraphs as if fully set forth herein.

324.    Defendants terminated Dr. Lerario because of sex and/or gender, including gender identity.

325.    Defendants is directly liable for the deprivation of Dr. Lerario's rights by exercising its authority to retaliate against her for her protected activities.

326.    Defendants aided and abetted in the deprivation of Dr. Lerario's rights because of discrimination against her based on sex and/or gender, including gender identity, by actually participating in the conduct giving rise to her claim for discrimination.

327.    As a direct and proximate result of Defendants' unlawful discrimination, Dr. Lerario has incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, damage to professional reputation, and other pecuniary and non-pecuniary losses.

328.    By engaging in the conduct described above, Defendants retaliated against Dr. Lerario with willful or wanton negligence, or recklessness or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard, with regard to Dr. Lerario's protected rights under NYCHRL § 8-107, for which Plaintiff seeks punitive damages.

**COUNT 13**
**NYCHRL § 8-107, et seq.**
**Retaliation**
**[As Against All Defendants]**

329.    Plaintiff realleges all previous paragraphs as if fully set forth herein.

330.    The effect of Defendants' acts complained of above was to deprive Dr. Lerario of equal employment opportunities as an employee because of retaliation for her complaints of discrimination in violation of NYCHRL § 8-107, et seq.

331.    By complaining to Defendants about the discriminatory practices and hostile work environment described herein and opposing said practices and hostile work environment directed at herself, Dr. Lerario engaged in activities protected by NYCHRL § 8-107, et seq.

332.    Dr. Lerario's exercise of protected rights was known to Defendants, because the complaints were made to Defendant during her employment.

333.    The action taken against Dr. Lerario up to and including her discontinuance were reasonably likely to deter a person from engaging in protected activities.

334.    Defendants is directly liable for the deprivation of Dr. Lerario's rights by exercising its authority to retaliate against her for her protected activities.

335.    Defendants aided and abetted in the deprivation of Dr. Lerario's rights because of retaliation against her for her protected activities by actually participating in the conduct giving rise to her claim.

336.    As a direct and proximate result of Defendants' unlawful discrimination, Dr. Lerario has incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, damage to professional reputation, and other pecuniary and non-pecuniary losses.

337.    By engaging in the conduct described above, Defendants retaliated against Dr. Lerario with willful or wanton negligence, or recklessness or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard, with regard to Dr. Lerario's protected rights under NYCHRL § 8-107, for which Plaintiff seeks punitive damages.

**COUNT 14**
**New York City Human Rights Law**
**NYCHRL § 8-107, et seq.**
**Hostile Work Environment Because of Disability**

338.    Claimant realleges all previous paragraphs as if fully set forth herein.

339.    Dr. Lerario was targeted for harassment and subjected to a hostile work environment because of her gender dysphoria.

340.    The discrimination that Dr. Lerario experienced was due to her being disabled or Defendants' perception of her as disabled.

341.    Defendants' did not undertake prompt and effective efforts sufficient to stop the hostile environment detailed herein.

342.    As a direct and proximate result of Defendants' unlawful discrimination, Dr. Lerario has incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, damage to professional reputation, and other pecuniary and non-pecuniary losses.

**COUNT 15**
**New York City Human Rights Law**
**NYCHRL § 8-107, et seq.**
**Disparate Treatment Because of Disability**

343.    Claimant realleges all previous paragraphs as if fully set forth herein.

344.    With or without reasonable accommodations, Dr. Lerario was qualified for the job with Defendants.

345.    Dr. Lerario requested reasonable accommodations of Defendants.

346.    Defendants denied Dr. Lerario's requests for reasonable accommodations.

347.    Defendants did not engage in a reasonably cooperative dialogue with Dr. Lerario in good faith regarding the requested accommodations.

348.    By so doing, Defendants failed to provide reasonable accommodations for Dr. Lerario's disabilities.

349.    The effect of the discrimination complained of above has been to deprive Dr. Lerario of equal employment opportunities and otherwise adversely affect her status as an employee because of her disabilities in violation of the New York City Human Rights Law, as amended.

350.    By creating, condoning, and perpetuating discrimination because of Dr. Lerario's disabilities, Defendants' has acted intentionally, maliciously and/or recklessly.

351.    As a direct and proximate result of Defendants' unlawful discrimination, Dr. Lerario has incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, damage to professional reputation, and other pecuniary and non-pecuniary losses.

**RECOVERY OF ATTORNEY FEES AND COSTS**

352.    Plaintiff incorporates by reference all previous paragraphs as if fully set forth herein.

353.    Plaintiff is mandatorily entitled to recover their attorneys' fees and costs pursuant to provisions of Title VII, N.Y. Exec. § 297(10) and NYCHRL § 8-120.

## JURY DEMAND

354.    Plaintiff hereby demands a trial by jury of all issues triable by a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Declare that the acts, practices, and omissions complained of herein are unlawful and violate Title VII, Declare that the acts, practices, and omissions complained of herein are unlawful and violate Title VII, NYSHRL § 296, et seq., and NYCHRL § 8-107, et seq.

B. Permanently enjoin Defendants and all persons in active concert or participation with them from engaging in the unlawful conduct of discriminating against employees based on sex and/or gender, including gender identity, or who oppose discrimination against them or participate in investigations regarding discrimination against them;

C. Order Defendants to institute and carry out policies, practices, programs, and training which provide equal employment opportunities for such employees, and which eradicate the effects of Defendants' past and present unlawful employment practices;

D. Order Defendant to re-hire Plaintiff and restore her to her job with back benefits, retirement contributions etc., and to make her whole;

E. Order other affirmative relief necessary to eradicate the effects of Defendants' unlawful employment practices;

F. Direct Defendant to pay for Dr. Lerario's past and future non-pecuniary losses resulting from the unlawful practices complained of in the foregoing paragraphs, including

emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation, in an amount to be determined at trial;

G.  Direct Defendant to pay Plaintiff back pay, in an amount to be determined at trial;

H.  Award Plaintiff's attorneys' fees, costs, and disbursements as provided by law;

I.  Direct Defendant to pay Plaintiff punitive damages, in an amount to be determined at trial; and

J.  Award such additional relief as justice may require.


Dated: August 10, 2020.

Respectfully submitted,

_____/s Jillian T. Weiss_____
Jillian T. Weiss, Esq. (JW 4542)
Law Office of Jillian T. Weiss, P.C.
442 15th Street, No. 1R
Brooklyn, New York 11215
(845) 709-3237
Fax (845) 684-0160
jweiss@jtweisslaw.com


*Attorney for the Plaintiff*